May it please the court. My name is Jeremiah Donovan. I didn't try this below, but I was pointed to represent Albie Doka on appeal. And I think probably the way I could best use my oral argument is to consider two questions. The first question, and of course you'll guide me away from those questions if you're interested in something else. The first question is the lawfulness of the initial approach by the police to Albie Doka. And the second question is what's a court of appeals do with a judge who has, I think in my brief I described it as a cavalier attitude toward the sentencing guidelines. So let me first talk about the lawfulness of the initial approach. Another view of that, of course, is not cavalier so much as he has very strong views about the guidelines. That's true. That's true. That is true. That is true. Let me say something about that. So what do you do about that? I tell my clients at great expense, at enormous efforts, the federal judicial system, the federal criminal justice system has interviewed and surveyed every federal district judge in the country over the course of many, many, many years. And what they've produced is the amalgamated wisdom of those judges in cases like these. One of the important parts of the sentencing statute is you've got to foster respect for the law. What's a defendant supposed to think when he walks in and finds out that the entire amalgamated wisdom of all the federal sentencing judges in America are treated with contempt by the district judge? Now, if the district judge sentences lower than the guidelines, then what's clear here is we have a Solomonic district judge far wiser than the accumulated wisdom of all these other oaths that are up there. Or if he sentences above the sentencing guidelines, what we have is an out of control hang-em-high judge who won't even listen to the wisdom of the other federal judges. Do your clients prefer the Solomonic judge? Yeah, yeah, yeah. I've been lucky enough to appear in front of a bunch of Solomonic judges in Connecticut, may it please the court. But in either case, it doesn't promote respect for the law. And so it seems to me that a judge has to give a little bit more. Now, look, I recognize the guidelines are advisory, and that's fine. I think that's fine. And but I just think more has to be done here. Are you objecting to the comments that he makes and made as opposed to... Both. Actually, is that what you're focusing on now? A little bit of both. I mean, nowhere during the course of this sentencing is the actual guideline range mentioned. I mean, nobody mentions it. Now, the government correctly points out and properly points out that the pre-sentence report sets forth what the guideline range is. And the judge comments that this guideline range is much too low. And perhaps we can infer from that that he knew what the guideline range was and considered it. But we don't know because he didn't exactly say what he thought the guideline range was. And it and it whatever it was, he thought he thought it was too low. It's also interesting such that the that the counsel who are obviously experienced and have appeared in front of Judge Rakoff frequently spent almost no time at all in their sentencing memoranda to describe the sentencing range or why why the judge should either go above or below it. So it seems to me, you know, I have I have another appeal right now. A little off stretch for us to make any inferences from that, I think. I think what you could say is it's at least necessary for what you've what you've already said is that it's necessary for the for the judge to to to recognize that the guidelines range is not mandatory to calculate what the what the level is to make rulings on whether he should down with Lee or up with Lee. You've already said that. But I think you should at least say he's got to actually say on the record, this is what the guideline range is. I think he should go a little bit further. I mean, in this case, he could easily have said, I think I should go above the guideline range because the guideline range isn't really isn't really designing. This isn't a heartland defense. I mean, this isn't a heartland probation violation. And I don't think the guidelines properly take into account the fact that I gave him a break the first time he was here. He cooperated, etc., etc. I think you have to I think a sentencing judge has to do more. I don't I don't mean to to say that you should be critical of the sentencing judges, you know, obvious expressions of contempt, but that that that's exactly what it is that causes there to not to be respect for the law and not be respect for the federal sentencing system of of that alone would be reversible or should be reversible error, the the failure to start out and mention in court what what the guidelines provide. I think Yeah, I think I think so. I think the judge has to start off by saying here's what the guidelines are. They want a downward departure for this, this and this, but I'm not going to do it. Government wants an upward departure for this, this and this. I'm not going to do it. I'm going to sentence within the guideline range. I'm not going to sentence one of the guidelines. Or, you know, or to say, I think the guideline range is proper. This is what it is. But I'm going to consider other factors in the sentencing statute and do a variance. That's what I think. That's what I'm arguing anyway. Let me let me jump over to the question of the of the lawfulness, lawfulness of the initial stop. I mean, the reason I chose this, I chose this argument because on the way down on the train, as I was, as I was, as I was, as I was reading my brief, I stood up to stretch and I looked back in the train and I saw that except for the people who were asleep, every single person on that train was mesmerized by something in their lap. So what do we have here? In this case, did they take it and try to shove it down on the I'm talking about the moment before that. OK, I'm going to stop before that moment. All right. The question here is the lawfulness of the initial approach. OK, so what do we have? He's double parked. I'll come back to that in a second. His interior light is on so you can see what's going on inside of it. The driver's door is open so that people walking by on the sidewalk can actually look in and see what he's doing. And he's looking down at his lap. The police pull and you can see all of this in the in the videotape. The police pull about maybe four car lengths in front of him. They watch him for eight minutes. He apparently he doesn't. He just looks and looks and looks and looks, doesn't look up after eight minutes or so. They pull back. They come to about a car length away from him and they pull forward. So when they stop, they're about two car lengths in front. So they haven't they haven't blocked him in. But they've but they've made it. One detective gets out of one side of the car. One detective gets out of the other. The detective on the on the passenger side has a flashlight. He's walking back. The detective on the on the passenger side on the driver's side of the car approaches the driver's the driver's the driver's door. I would say that at that moment, a reasonable citizen would not feel that he was free to come and go as he wished, that he wouldn't he was free to break off the encounter. And it seems to me that in order to justify the initial approach at that point, you have to have reasonable suspicion based upon specific and articulable facts that wrongdoing is afoot. Now, now, no one's testified. It's a high crime area. The car is double parked. But these are two detectives, not traffic control guys, not beat detectives. Neither of them testified. We're going back to tell him to move his car or we're going back there to give him a ticket. Actually, when he's arrested seven days later, they don't give him a ticket for double parking. But I suppose that the events in the meantime are so serious that they that their double parking has kind of disappeared. I don't think that that initial approach was valid. And the reason this is important is because, you know, under New York law, if the if one of the elements of the crime is that you had the intent to prevent a law enforcement officer from performing his lawful duty, and Volaton and other cases in New York say, if the officer's approach wasn't lawful, then that element is unsatisfied. Mr. Donovan, we'll hear more from you by way of rebuttal. May it please the Court. My name is Matthew Hellman. I'm an assistant United States attorney in the Southern District of New York. I represent the United States in this appeal, as I did in the proceedings below, addressing counsel's comments, taking them in the order counsel did. I'll note first that the guidelines were addressed during the sentencing proceeding. In fact, Judge Rakoff referred to the guidelines pertaining to the assault of the police officer as being ridiculously low. It is clear from Judge Rakoff's comments that the judge considered the guidelines, and in Judge Rakoff's opinion, in fact, the guidelines were too low to address the seriousness of the conduct weighed against the defendant's particular history in the case. Judge Rakoff once described the guidelines in a case in which I was a federal prosecutor as ridiculously high. I think that And I thought that that was considering the guidelines. I would agree that it was, but that speaks, I think, to the care with which Judge Rakoff approaches the guidelines. Clearly, the district judge has strong opinions about them, and therefore it is obvious that the Court considers them in great detail when fashioning a sentence which is either above consistent with or below an applicable guidelines range, which, as of course, the Court is aware in this case, follow the policy statements in Chapter 7, which were considered by Judge Rakoff explicitly during the sentencing proceeding. Judge Rakoff decided against following the policy statement guidelines and instead varied upward from them. Addressing the lawfulness of the approach, this was not discussed in the lower court proceedings because it was so obviously a lawful approach. In the first instance, as a matter of law, the fact that Doka's vehicle was double parked gave the officers reason enough to approach the vehicle and engage in an encounter with Doka. The encounter could have proceeded well beyond that even had Doka not stuffed the plastic bag in his lap next to his seat and out of sight from the officer. But in any event, the circumstances preceding their approach gave them more than enough reason to simply approach the parked or standing vehicle where it was and look inside to see what was going on. I think this is part of the point that was being made, but you would agree that someone just looking down at their lap, if they were not double parked, that's not nearly enough. Absolutely. That's not this case. Correct. A person simply looking downward, even for eight minutes or ten minutes, is not on its own, objectively or credibly, a reason for police to suspect anything unlawful going on. I guess in the days now of iPhones, one is expected to look down in your lap for many minutes at a time. It seems to be the mode of the day. But here, the detectives testified that it was more than Doka simply gazing down at his lap. It was where Doka's car was located, the fact that the driver's door was open, the dome light was illuminated, that the vehicle was in the pathway of traffic, although closer to where the cars were parked on the left-hand side of the road, and that the officer's had passed once and then driven around the block, backed slowly towards the car and remained observing Doka for approximately eight minutes and observing no change in his behavior, made the decision to satisfy their reasonable curiosity by simply walking near the car and checking to see if Doka was, for example, looking at a phone or engaged in narcotics activity. It bears mentioning that there's nothing in the record to suggest that it was in fact a phone. For example, there's no testimony that there was illumination of Doka's face. The blue light, which is the telltale sign that a smartphone is being used, was not in the record. What time was this? I believe after 9 p.m. It was dark. Unless the Court has further questions, the government rests on its submission. Thank you very much. Mr. Mulroney, you're reserved two minutes. Take away his looking down at the phone. What do you got? He's double-pocked. Well, the police were double-pocked, too. When they pulled over in front of him, it didn't obstruct the traffic. They didn't testify they were going to give him a ticket or they were going to reprimand him for being double-pocked. They testified they didn't know what he was doing. They wanted to go see. Anybody who has a spouse who keeps them waiting should feel great sympathy for Doka because you sit there and you look at your cell phone and you wait for them. Maybe you've got the door open for when they come. I mean, it just strikes me that clever police officers can take the most innocent set of factors and make them sound suspicious to justify an approach. I mean, let me think. Judge Kubranas, you know, Judge Sachs throughout the course of this argument, I haven't seen his hands. I don't know what's on his lap. He's positioned himself in a way so he can see if any law enforcement officers are coming in. He's dressed very strangely. I've never seen people on the street. Well, I went to Cambridge for a year, so we did dress like that. But in America, you never see people dressed on the street. This is all very suspicious. We should approach Judge Sachs and find out what it is that he's doing. That's what worries me about this case. Thank you. Thank you, Your Honor. I appreciate you. I look forward to seeing you further. Thank you. Thank you.